**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

ANELLO FENCE, LLC,

     *Plaintiff,*

     v.

VCA SONS, INC. d/b/a FREEDOM
FENCE, *et al.,*

     *Defendants.*

Civil Action No. 13-3074 (JMV) (JBC)

**OPINION**

**John Michael Vazquez, U.S.D.J.**

     This trademark case arises out of a family dispute over the use of the last name "Anello" in competing outdoor fencing businesses in northern New Jersey. D.E. 1. Plaintiff Anello Fence, LLC, is owned by S. Steven Anello. Defendant VCA Sons, Inc. ("VCA") d/b/a Freedom Fence, is owned by Steven's cousins: Vincenzo Anello, Jr.; Salvatore Anello; Christopher Anello; and Anthony Anello. Plaintiff sued for trademark infringement, contributory trademark infringement, misrepresentation, false designation of origin, false advertising, unfair competition, unjust enrichment, and tortious interference. D.E. 1. Defendant VCA has counterclaimed for cancellation of trademark registration, false advertising, cybersquatting, and unfair competition. D.E. 59.

     Currently pending before this Court are three motions: (1) Defendant VCA's motion for summary judgment on Plaintiff's Counts I and II (Sections 32(a) and 43(a) of the Lanham Act, 15

U.S.C. § 1125), D.E. 133; (2) Defendant VCA's motion for summary judgment[1] on the remaining

counts, D.E. 134; and (3) Defendant VCA's motion in limine to preclude the testimony of

Plaintiff's damages expert, Gary Rosen, D.E. 135. After the initial briefing, Plaintiff requested

leave to supplement the record with certain additional arbitration awards. D.E. 149. The Court

reviewed all submissions,[2] and considered the motions without oral argument pursuant to Fed. R.

Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons that follow, Plaintiff's request to supplement

the record is granted, Defendant VCA's motions for summary judgment are granted, and

Defendant VCA's motion in limine is denied as moot.

## I. BACKGROUND & PROCEDURAL HISTORY[3]

This case centers on a family dispute among cousins who operate competing fencing

businesses. In 1963, brothers Emilio Anello, Sr. and Joseph Anello started Anello Brothers, Inc.,

a fencing company in northern New Jersey. Oleski SOMF ¶ 8. Their younger brother, Vincenzo

Anello, Sr., joined the business in 1971. *Id.* Steven, the owner of Plaintiff Anello Fence, is the

son of Emilio Sr., and the nephew of Vincenzo Sr. McDaniel SOMF ¶¶ 3-5. The owners of

---

[1] Defendant entitles this motion as a "motion to dismiss" both in its caption and preliminary statement. D.E. 134-1 at 1. However, Defendant then states that it "seeks summary judgment" and cites to the relevant summary judgment standard. *Id.* at 5. Summary judgment is also requested in the conclusion. *Id.* at 17. Plaintiff also opposes the motion on summary judgment grounds. The Court therefore construes Defendant's motion as one for summary judgment.

[2] Defendant submitted briefs from two separate counsel. Defendant's briefs in support of its motions for summary judgment are referred to as "Oleske Br.," D.E. 133, and "McDaniel Br.," D.E. 134-1. Plaintiff's combined opposition is referred to as "Pl. Opp'n," D.E. 139. Defendant's replies are referred to as "Oleske Reply," D.E. 144, and "McDaniel Reply," D.E. 142.

[3] To the extent that the facts are not in dispute, the Court cites to Plaintiff's Complaint ("Compl."), D.E. 1, and Defendant's statements of material facts ("Oleske SOMF" and "McDaniel SOMF"), D.E. 133 at 6-8; D.E. 134-17. The Court also cites to Plaintiff's response and counter statement of facts ("Pl. RESP"), D.E.140-1, Defendant's response to Plaintiff's counter statement of facts ("Def. RESP"), D.E. 142-1, and underlying exhibits at times. The Court also borrows from factual recounts given in prior opinions issued by the Court in this case.

Defendant VCA, Vincenzo Anello, Jr.; Salvatore Anello; Christopher Anello; and Anthony Anello, are the sons of Vincenzo Sr. and the cousins of Steven. *Id.* at 7; Oleske SOMF ¶ 7. Plaintiff Anello Fence is in Morris County, New Jersey and is a "fence contractor that sells, installs, maintains and manufactures both residential and commercial fences[.]" Oleske SOMF ¶¶ 2-3. Defendant VCA offers similar products and services and is located within a mile of Plaintiff. *Id.* ¶¶ 10, 44.

Some of the above-mentioned individuals and entities are no strangers to litigation amongst themselves. Plaintiff references a number of prior adjudications in efforts to bolster its present claims. Since Plaintiff relies so heavily on these prior adjudications, primarily in arguing issue preclusion, the Court examined them. Because Plaintiff often mischaracterized the nature and outcome of these prior adjudications, the Court includes an accurate description of these prior matters. The Court also borrows from the factual accounts detailed in these prior adjudications to shed light on the events surrounding and leading up to the present case.[4]

The first matter began in 2003. *See* D.E. 140-3, Ex. A. After Joseph retired from Anello Brothers, the relationship between Emilio Sr. and Vincenzo Sr. began to deteriorate as their sons entered the business. D.E. 140-4, Ex. G at 2. The two brothers could not agree on the roles of their respective sons. *Id.* In 2003, the brothers decided that only one son each could work at Anello Brothers. *Id.* As a result, three of Vincenzo Sr.'s sons departed and started VCA Sons (which stands for Vincenzo and Catherine Anello's sons). *Id.*; Oleske SOMF ¶¶ 1-2.

---

[4] As will be discussed, the Court finds that the cited matters actually hinder, not help, Plaintiff's cause. Because Plaintiff submitted the information in support of its opposition, the Court knows of no legal impediment to considering the matters as they ultimately undercut Plaintiff's arguments.

Following the creation of VCA in 2003, Emilio Sr., acting individually and on behalf of Anello Brothers, filed a verified complaint against Vincenzo Sr., VCA, and Salvatore. D.E. 140-3, Ex. A. Essentially, Emilio Sr. believed that Vincenzo Sr. was steering business away from Anello Brothers and to his sons at VCA. D.E. 140-4, Ex.G. at 3. Therefore, he requested an order to show cause with temporary restraints to, among other things: (a) terminate Vincenzo Sr.'s employment at Anello Brothers; (b) require Vincenzo Sr., Salvatore, and VCA to turn over all Anello Brothers confidential business information and property; and (c) bar VCA from using the Anello name in conducting its business. D.E. 140-3, Ex. A at 2. Vincenzo Sr., VCA, and Salvatore did not file an opposition to this emergent request. *Id.*

Plaintiff alleges that this 2003 litigation "resulted in the issuance of an injunction, dated December 8, 2003, enjoining those defendants from using the 'Anello' name." Pl. Opp'n at 6. Plaintiff is mistaken as to the scope of the order. The December 8, 2003 court order ("2003 Order") clearly grants "temporary relief . . . pending a hearing on Plaintiff's application for a preliminary injunction." D.E. 140-3, Ex. A at 2. The 2003 Order is not a preliminary injunction, permanent injunction, or final judgment. Rather, it appears that the actual outcome of the litigation was an order requiring that Anello Brothers be sold to a third party or liquidated and dissolved by December 31, 2005. D.E. 140-4, Ex. G at 3.

The next cited litigation began in 2011 (the "2011 Lawsuits"). *See* D.E. 140-4, Ex. G. By way of background, in 2005, Steven decided to move to Florida with his family, intending at the time to permanently relocate. Oleske SOMF ¶ 6. In the years prior, he had also started his own New Jersey fencing company, A Decorative Fence Company. D.E. 140-4, Ex. G at 2. However, given his move to Florida, he decided to sell his business. Oleske SOMF ¶ 6. In 2006, Steven sold A Decorative Fence to VCA and began full-time employment in Florida as a law enforcement

officer. D.E. 140-4, Ex. G at 2; Oleske SOMF, Ex. A at 50 ¶¶ 18-23. Part of his sale of A Decorative Fence included a restrictive covenant prohibiting him from returning to the northern New Jersey fencing industry for a certain period. D.E. 140-4, Ex. G at 3.

Shortly before Thanksgiving 2006, Emilio Sr. unilaterally closed Anello Brothers. *Id.*; McDaniel SOMF ¶ 17. Upon this closing, Steven returned to New Jersey and formed Plaintiff Anello Fence on or about March 15, 2007. D.E. 140-4, Ex. G at 3; Compl. ¶ 19. Steven alleges that he used the name "Anello" in "Anello Fence, LLC" because it was his last name and he felt that the name was well known in the fencing industry. Oleske SOMF ¶ 11. In April 2007, Steven paid VCA $30,000 to void his restrictive covenant. D.E. 140-4, Ex. G at 3.

On November 17, 2009, Anello Fence secured a trademark on the Supplemental Register of the United States Patent and Trademark Office ("PTO") for its logo "ANELLO FENCE" (Reg. No. 3,713,566) in stylized lettering, with a triangle partially forming the letter A. McDaniel SOMF ¶ 18; D.E. 134-6, Ex. D at 12. The registration claimed first use of the mark in March 2007. McDaniel SOMF ¶ 18. The mark was subsequently cancelled on June 24, 2016. D.E. 134-6, Ex. D at 2. Therefore, it is not in dispute in this action.

On July 22, 2010, Anello Fence applied to register "ANELLO" on the Principal Register. *Id.* ¶ 19; D.E. 134-7, Ex. E at 27. It claimed first use in *April 1963*. *Id.* As noted, Anello Fence had only been in business since 2007; Anello Brothers had been in business from 1963 until it closed in 2006. The examiner refused registration as the mark was "merely a surname." McDaniel SOMF ¶ 20. On November 16, 2010, Anello Fence amended its application, alleging that the mark had "become distinctive of the goods/services through applicant's *substantially exclusive and continuous use in commerce for at least the five years immediately before* the date of this statement." *Id.* (emphasis added). At the time, and as noted, Plaintiff Anello Fence had only been

in business for a little over three and a half years. *See* Compl. ¶ 19. Nonetheless, on July 5, 2011, the examiner issued Anello Fence the service mark ANELLO (Reg. No. 3,988,606) on the Principal Register. McDaniel SOMF ¶ 21; D.E. 134-7, Ex. E.

On March 21, 2013, Anello Fence applied to register "ANELLO FENCE" on the Principal Register as well. D.E. 134-8, Ex. F at 2. Again, Plaintiff claimed first use in *April 1963*. *Id.* at 5. Also, on its application, Plaintiff again asserted that "[t]he mark has become distinctive of the goods/services through the applicant's substantially exclusive and continuous use in commerce . . . for at least the five years immediately before the date of this statement." *Id.* at 33-34. By this time, Anello Fence had been in operation for over five years. *See* Compl. ¶ 19. On October 29, 2013, the examiner issued Anello Fence the service mark ANELLO FENCE (Reg. No. 4,425,251) in stylized lettering, with a triangle partially forming the letter "A" on the Principal Register. D.E. 134-8, Ex. F at 2.

In the meantime, in Spring of 2011, Anello Brothers -- which had been "essentially defunct" since 2006, *see* D.E. 140-4, Ex. H. at 4 – held a shareholders' meeting. D.E. 140-4, Ex. G at 3. At the shareholders' meeting, Emilio Jr. joined with Vincenzo Sr. to oust Emilio Sr. from his position as president of the company. *Id.* The remaining shareholders then decided to re-open Anello Brothers (also doing business as Anello Brothers Fence Company, *id.* at 6 n. 5) over Emilio Sr.'s objection. *Id.* at 3.

Upon this re-opening, Steven, acting individually and on behalf of Plaintiff Anello Fence, sued the principals of Anello Brothers in April 2011 to prevent them from using the Anello name, asserting that he had spent much money developing and enhancing the goodwill of the name after Anello Brothers' 2006 closing. *Id.*; *see also* D.E. 140-3, Ex. C. Plaintiff correctly notes that this action produced an order to show cause with temporary restraints ("2011 Order"), enjoining Anello

Brothers from "using the name 'Anello' in the operation or advertisement of any fence company." Pl. Opp'n at 6-7; *see* D.E. 140-3, Ex. C at 1-2. However, the 2011 Order with temporary restraints did not materialize into a preliminary injunction, permanent injunction, or final judgment. *See* D.E. 140-4, Ex. G at 3-4. Instead, the case was consolidated with two other actions between the parties, the 2011 Lawsuits, and the parties agreed to binding arbitration to settle the matters. *Id.*

The 2011 Lawsuits resulted in a series of arbitration decisions by Arbitrator Edwin Stern, a retired New Jersey Appellate Division Judge. Plaintiff claims that these arbitration decisions "preclude[] Defendant from asserting any right to use the 'Anello' name in any manner, business or trade name, or advertisement in the fencing industry." Pl. Opp'n at 7. All of the arbitration decisions listed the same named parties: Steven, Vincenzo Sr., Catherine (Vincenzo Sr.'s wife), and Emilio Sr. D.E. 140-4, Ex. G, H, I; D.E. 149, Ex. A, B. Neither VCA nor any of its principals were parties to any of the arbitrations or subject to the decisions.

The October 14, 2015 arbitration award ("First Arbitration Award") primarily involved a dispute between Steven, Vincenzo Sr., and Emilio Sr., who were all seeking different relief. *See* D.E. 140-4, Ex. G., at 4. Stern first acknowledged that Steven sought a permanent restraining order precluding any other person or entity (except himself) from using the Anello name in the fence business. *Id.* Stern noted that Vincenzo Sr. sought to use the name given his years of operation of Anello Brothers and the goodwill and reputation he built. *Id.* Stern further observed that Emilio Sr. sought liquidation and dissolution of Anello Brothers and the sale of all assets and inventory. *Id.*

Stern first ruled that Emilio Sr. and Vincenzo Sr. were each entitled to 50% of the value, if any, of Anello Brothers. *Id.* at 6. Critically, Stern expressly stated that he could not "address the trademark issue, as it is a federal question beyond the jurisdiction of the arbitration of this state

action and is pending in federal court." *Id.* at 15. The pending federal action referred to is the current matter. Stern further noted that Anello Brothers "was closed in November 2006, and Steven's father [Emilio Sr.], then corporate president, had no objection to Steven's use of the Anello name." *Id.* Yet, there was no indication of an assignment of Anello Brothers to Steven. *Id.* Additionally, Stern continued, Emilio Sr. was not the only owner of Anello Brothers at the time. *Id.* As Stern explained, Vincenzo Sr. was also a 50% owner and had worked in the business his entire adult life, enhancing the name Anello and its goodwill. *Id.* Therefore, Stern ruled that he would not "preclude Vincenzo [Sr.] from using the name Anello Brothers or Anello Brothers Fence Company, if he wishes to use it while Steven operates the Anello Fence Company." *Id.* at 16. Stern found "no incompatibility in the respective use of those names," *id.,* but noted that "the federal court may have jurisdiction and authority to consider and address this issue incident to the trademark litigation," *id.* at 16, n. 12.

Stern then continued to rule in his First Arbitration Award that "[i]f Vincenzo [Sr.] wants to use the name Anello Brothers," then "Steven is entitled to compensation for costs and expenses undertaken by him in obtaining, promoting and enhancing the Anello name after Anello Brothers closed in 2006," requiring Vincenzo Sr. to "reimburse Steven for his counsel fees in connection with the [2011 Order] and the order dissolving the corporation shall be vacated." *Id.* at 15. Stern also concluded that as to the other defendants in 2011 Lawsuits, "Steven *did not* sustain his burden in proving independent claims." *Id.* at 16, n. 14 (emphasis added).

On December 18, 2016, Judge Stern issued a Third Supplemental Arbitration Award,[5] addressing the counsel fees that the First Arbitration Award provided to Steven "as compensation

---

[5] Plaintiff does not rely on, or cite to, the other supplemental awards other than those discussed herein.

for vacating the [2011 temporary] injunction." D.E. 140-4, Ex. H at 1. Steven, who was awarded

counsel fees, and Vincenzo Sr., who was ordered to pay such fees, were the relevant parties to this

Third Supplemental Arbitration Award. Stern, however, made clear the following:

> Vincenzo [Sr.] also makes arguments addressed to the propriety of
> the trademark application and statements made by Steven in the
> course of the state and federal proceedings. *The parties have agreed
> from the beginning of the arbitration that issues relating to the
> trademark and federal action cannot be part of this arbitration
> which flows from settlement of the State court action.* Through a
> letter from Mr. [Mark] Ingber, [legal counsel to Steven,] Steven
> insists that the trademark proceedings preclude commercial use of
> the Anello name by his uncle and uncle's immediate family. Suffice
> it to say, however, that *the parties before me agree that challenges
> to the trademark and its impact remain for resolution in federal
> court.*

*Id.* at 4 (emphases added). Stern repeatedly noted that his decision could be impacted by the

pending federal court action. *See id.* at 5 ("Steven deserves compensation for having to give up

rights he secured, at least rights he secured in the short term before the federal court speaks as to

the permanency and scope of those rights."); *see also id.* at 7 n. 3 ("This award again recognizes

the fact that federal litigation is pending, and that it may impact parts of my award.").

On June 2, 2016, Stern issued a Fifth Supplemental Arbitration Award after Vincenzo Sr.

formally advised that he elected not to pay Steven the amount awarded for costs and expenses

undertaken by Steven to enhance the name after Anello Brothers' 2006 closure. D.E. 140-5, Ex. I

at 1. Stern then visited two signs for Freedom Fence to determine whether they were promoting

Anello as a trade name. *Id.* Stern concluded that the first sign did not display Anello at all and

the second sign displayed Anello boldly under the letters "V" and "C" but concluded that the sign

need not be taken down because it was difficult to see from the street. *Id.* at 1-2. Stern then opined

that it would be prudent for Vincenzo Sr. to "make clear that Anello refers to use of a family name

only" in any future public display of the name. *Id.* at 2. Stern concluded that he "believe[d] this decision terminates the [state court] proceedings as between Steven and Vincenzo [Sr.]" *Id.*[6]

As noted, the pending federal trademark action referenced in the foregoing arbitration awards is the matter before the Court. Plaintiff filed its Complaint on May 14, 2013 against VCA, Clipper Magazine, Inc. ("Clipper"), and Shopper's Guide, LLC ("Shopper"), alleging seven counts: (I) trademark infringement under the Section 32(a) of the Lanham Act, 15 U.S.C. § 1114(1)(a), against all Defendants; (II) misrepresentation, false designation of origin, false advertising, and unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), against all Defendants; (III) contributory and/or vicarious trademark infringement against Defendants Clipper and Shopper; (IV) common law false advertising and unfair competition against all Defendants; (V) unfair competition under N.J.S.A. § 56:4-1 against all Defendants; (VI) unjust enrichment against all Defendants; and (VII) tortious interference against all Defendants. D.E. 1. Defendant Clipper was later dismissed with prejudice from this action pursuant to a consent order. D.E. 24. The Court stayed Plaintiff's later motion for default judgment against

---

[6] After the initial briefing, Plaintiff requested permission to supplement the record with two additional supplemental arbitration awards. D.E. 149. VCA objected. D.E. 150. The Court grants Plaintiff's request, but finds that the additional submissions do not aid Plaintiff's case. In the Tenth Supplemental Arbitration Award, Steven and Anello Fence were awarded two telephone numbers over the objection of Vincenzo Sr. and Anello Brothers (non-parties to the current action). D.E. 149, Ex. A at 1-2. In the Eleventh Supplemental Arbitration Award, Steven and Anello Fence were awarded the option to purchase one of Anello Brother's phone numbers (since Anello Brothers has been dissolved), but not VCA's fax number. D.E. 149, Ex. A at 3-4. Again, both of these supplemental arbitration decisions stem from the 2011 Lawsuits and prior arbitration awards discussed above, where Stern explained that he does not have jurisdiction over the federal trademark issue. The Court finds that Plaintiff's argument regarding the relevancy of these documents is misguided.

Shopper until the issue of the ownership and validity of the ANELLO mark had been litigated on the merits.[7] D.E. 53.

Defendant VCA answered Plaintiff's Complaint on July 3, 2013, and asserted twelve counterclaims/third-party claims on behalf of Defendant VCA and third-party plaintiff Anello Brothers, against counterclaim/third-party defendants Anello Fence, Steven, and Mark Ingber, Esq. (Steven's attorney) (collectively "CC Defendants"), alleging (I) false or fraudulent trademark registration under 15 U.S.C. § 1120 against all CC Defendants; (II) cancellation of trademark registrations against Steven and Anello Fence; (III) false advertising under Section 34(a) of the Lanham Act, 15 U.S.C. § 1125, against Steven and Anello Fence; (IV) reverse passing-off under 15 U.S.C. § 1125(a), against Steven and Anello Fence; (V) cybersquatting under 15 U.S.C. § 1125(d), against Steven and Anello Fence; (VI) common law trademark infringement against Steven and Anello Fence; (VII) unfair competition under N.J.S.A. §§ 56:4-1 and 56:4-2, against Steven and Anello Fence; (VIII) unlawful interference with prospective economic advantage against Steven and Anello Fence; (IX) fraud as to all CC Defendants; (X) unjust enrichment as to Steven and Anello Fence; (XI) tortious interference with contract as to all CC Defendants; and (XII) malicious abuse of process against all CC Defendants. D.E. 13.

On August 6, 2013, Plaintiff moved to dismiss the counterclaims/third-party claims. D.E. 18. On March 14, 2014, Judge Cecchi adopted Judge Clark's Report and Recommendation, D.E. 45, and dismissed third-party plaintiff Anello Brothers from the action as they were improperly joined without a motion to intervene. D.E. 50. Judge Cecchi then ordered VCA to submit an

---

[7] Thus, in this decision, the Court is referring to VCA when it uses the term Defendant without any further clarification.

amended answer including only the counterclaims relevant to VCA – not Anello Brothers – as this distinction was unclear in the original Answer. D.E. 52.

Rather than filing an amended answer, on March 27, 2014, VCA applied for an order to show cause with temporary restraints allowing VCA to include the phrase "Third Generation Family Owned & operated Business by Salvatore Anello, Vincenzo Anello, Jr., Christopher Anello, and Anthony Anello" in its advertising during the pendency of the action. D.E. 55. On April 11, 2014, Judge Cecchi denied this application, reasoning that VCA's "only justification for emergent relief is that '[a]s a result of this litigation, Clipper Magazine, Inc. and Shopper's Guide, LLC have refused to run advertisements for Freedom Fence which reference, in any way, [Christopher] or [Christopher's] brothers' full names,'" but "[t]his matter has been pending for nearly a year" and Defendants submission "contains no statement as to why the requested relief has suddenly become emergent, necessitating a procedure other than by notice of motion." D.E. 57 at 1-2.

Defendant VCA then filed an Amended Answer on May 6, 2014, alleging the following counterclaims: (I) cancellation of trademark registration; (II) false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125; (III) cybersquatting pursuant to 15 U.S.C. § 1125(d); and (IV) unfair competition under N.J.S.A. §§ 56:4-1 and 56:4-2. D.E. 59. Former third-party defendant Mark Ingber, Esq. was not included, and he was dismissed as a party in this case. *See* D.E. 59; D.E. 100 at 3 n. 3.

On August 12, 2014, Plaintiff moved to dismiss the counterclaims in Defendant's Amended Answer. D.E. 70-2. On January 27, 2016, Judge Cecchi granted this motion in part and denied it in part. D.E. 100, 101. Judge Cecchi granted the motion to dismiss as to Steven,

dismissing him as a third-party defendant to the action, but denied the motion as to Anello Fence. *Id.* The remaining parties – Anello Fence, VCA, and Shopper – then conducted discovery.

On March 26, 2018, VCA moved for summary judgment. D.E. 133, 134. Jerald Oleske, Esq. submitted a brief on VCA's behalf as to the first two counts in the Complaint (violations of Sections 32(a) and 43(a) of the Lanham Act), D.E. 133, and Jay McDaniel, Esq. submitted a brief on VCA's behalf that also addresses the remaining counts and counterclaims/third-party claims, D.E. 134-1. Plaintiff filed a single opposition, D.E. 140, to which VCA's attorneys separately replied, D.E. 142, 144. VCA also filed a motion *in limine* on March 26, 2018, seeking to preclude the expert testimony of Plaintiff's damages expert, Gary Rosen. D.E. 135-1. Plaintiff opposed this motion, D.E. 139, and VCA replied, D.E. 141.

## II.   SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). In other words, a court's role in deciding a motion for summary judgment is not to evaluate

the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

## III. ANALYSIS

Issue Preclusion/Collateral Estoppel

Citing the 2003 Order, the 2011 Order, and the arbitration rulings, Plaintiff primarily argues that VCA is not entitled to summary judgment because of issue preclusion. For the reasons that follow, issue preclusion (also commonly referred to as collateral estoppel) is not applicable.[8]

"[A] federal court, in determining the collateral estoppel effect of a state court proceeding, should apply the law of the state where the . . . proceeding took place[.]" *Taylor v. S.T. Good Ins., Inc.*, No. 10-4258, 2012 WL 83650, at *3 (D.N.J. Jan. 11, 2012) (quoting *Anela v. City of Wildwood*, 790 F.2d 1063, 1068 (3d Cir. 1987)). Here, all former proceedings took place in New Jersey, therefore the Court applies New Jersey issue preclusion law.[9]

Under New Jersey law, the party asserting the doctrine of issue preclusion must show the following:

---

[8] Moreover, the Court is dismayed at Plaintiff's representations concerning the contents and effects of the 2003 Order, the 2011 Order, and the arbitration awards. Plaintiff's representations are, to say the least, not accurate.

[9] As to the arbitration awards, Plaintiff has not provided proof that any of the awards were confirmed by a court of competent jurisdiction. However, pursuant to New Jersey law, it is not clear whether the awards must be confirmed before issue preclusion applies. *See, e.g., Rasmussen v. Vineland Bd. of Educ.*, 2014 WL 7236525, at *8 (N.J. Super. Ct. App. Div. Dec. 22, 2014) ("[Plaintiff] argues that the arbitrator's decision should not be given preclusive effect because it was not reviewed. He misunderstands the exception. The issue is whether judicial review was available, not whether it was in fact sought."). On the other hand, when a state arbitration decision has not been confirmed, federal courts have applied federal preclusion law and award the decisions no preclusive effect. *See, e.g., Kisby Lees Mech. LLC v. Pinnacle Insulation, Inc.*, No. 11-5093, 2012 WL 4442768, at *5 (D.N.J. Sept. 24, 2012) (analyzing the preclusive effect of an unconfirmed arbitration award in a state law breach of contract action and recognizing that "unconfirmed arbitration awards are not entitled to recognition under the Full Faith and Credit Statute, [28 U.S.C. § 1738].").

Here, even if the arbitration awards were confirmed, the Court finds that they do not result in a finding of issue preclusion. As a result, the Court notes the foregoing issue concerning confirmation but does not rule on it.

> (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.

*Fields v. City of Salem Hous. Auth.*, 710 F. App'x 567, 571 (3d Cir. 2017) (quoting *Olivieri v. Y.M.F. Carpet, Inc.*, 186 N.J. 511, 521 (2006)). Nevertheless, even when the requirements of issue preclusion are otherwise met, "the doctrine, which has its roots in equity, will not be applied when it is unfair to do so." *Olivieri*, 186 N.J. at 521-22.

In certain circumstances, New Jersey permits issue preclusion to be asserted by a person who was not a party (or in in privity with the party) to the earlier action. Defensive issue preclusion "'permits a defendant who was not a party to an action involving a common plaintiff to use a finding of fact from the prior action to preclude litigation of the issue in a pending case.'" *Ivashenko v. Katelyn Court Co.*, 401 N.J. Super. 99, 109 (App. Div. 2008) (quoting *Konieczny v. Micciche,* 305 *N.J.Super.* 375, 385 (App.Div.1997)). New Jersey also recognizes offensive issue preclusion – in which a plaintiff who was not a party to the earlier action uses the doctrine against a defendant who was a party in the earlier matter – but its application is much more restrained than defensive issue preclusion. *Kortenhaus v. Eli Lily & Co.*, 228 N.J. Super 162, 164-655 (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979)). *See also Perry v. Tuzzio*, 288 N.J. Super. 223, 232, 672 A.2d 213, 217 (App. Div. 1996) ("Although we recognize that mutuality of estoppel is not an absolute prerequisite, the doctrine will not be applied to a non-party where the economy of resorting to the doctrine is substantially outweighed by considerations of fairness, particularly where the doctrine is invoked offensively rather than defensively.")

Here, the parties to the earlier adjudications often varied from the present case. Plaintiff, however, completely fails to address privity. The New Jersey Supreme Court has "described the concept of privity as being "necessarily imprecise." *Allen v. V & A Bros.*, 208 N.J. 114, 139 (2011) (quoting *Zirger v. Gen. Accid. Ins. Co.*, 144 N.J. 327, 338 (1996)). "[I]t is merely a word used to say that the relationship between the one who is a party on the record and another is close enough to include that other within the *res judicata*." *Id.* "In general, a relationship is considered 'close enough' only when the party is a virtual representative of the non-party, or when the non-party actually controls the litigation." *Id.* (internal quotations and alterations omitted).

Plaintiff seeks to use issue preclusion against Defendant VCA. VCA was a party to the 2003 Order so privity is not an issue. *See* D.E. 140-3, Ex. A. However, neither Steven nor Anello Fence were parties to the action. Plaintiff has not produced any evidence that he was in privity with the plaintiff (his father) in that action. Therefore, Plaintiff appears to be arguing some form of non-mutual, offensive issue preclusion. Yet, Plaintiff advances no argument as to why the more heightened standard for granting non-mutual, offensive issue preclusion as to the 2003 Order is met in that case. In fact, Plaintiff does not even address the issue of offensive issue preclusion. As a result, the 2003 Order does not result in issue preclusion.

One of VCA's owners, Christopher, was party to the 2011 Order, therefore Defendant VCA is potentially in privity with him. *See* D.E. 140-3, Ex. C. Yet, without further information, the Court cannot conclusively find that VCA was in fact in privity with Christopher. As a result, Plaintiff's argument fails on privity grounds as to the 2011 Order.

As noted, the arbitration (and resulting decisions) involved Steven, Vincenzo Sr., Catherine (Vincenzo Sr.'s wife), and Emilio Sr. VCA was not involved and neither were VCA's owners. The record does not indicate that Catherine or Emilio Sr. were affiliated with VCA. As to

Vincenzo Sr.'s affiliation with VCA, the record does not indicate that he ever worked for VCA or represented the company in any way. Again, as the party asserting issue preclusion, Plaintiff bears the burden of showing its applicability, and Plaintiff fails to submit any sufficient evidence from which the Court could conclude that VCA was in privity Vincenzo Sr. or Catherine. Plaintiff's argument fails for this reason.

Plaintiff's issue preclusion assertion fails for additional reasons. First, the 2003 Order was only a temporary restraining order. D.E. 140-3, Ex. A at 2 (the order granted "temporary relief . . . pending a hearing on Plaintiff's application for a preliminary injunction"). There is no evidence of an injunction (either preliminary or permanent), as Plaintiff claims, Pl. Opp'n at 6, and no evidence of a final judgment. There is no evidence that the pertinent issues were fully litigated before the temporary restraints were issued. Instead, based on the subsequent arbitration decisions, it appears that the parties settled the dispute on terms without any restraints. D.E. 140-4, Ex. G at 3. Therefore, Plaintiff fails to establish a final judgment as to the 2003 Order, much less that the disputed issues were essential to that judgment. The 2011 Order suffers from the same infirmities as the 2003 Order. The 2011 Order was, again, only a temporary restraining order. D.E. 140-3, Ex. C. There is no evidence that it materialized into a preliminary injunction, permanent injunction, or final judgment. The evidence indicates that this action was consolidated with other pending litigation between the family members (the 2011 Lawsuits) and sent to arbitration. *See* D.E. 140-4, Ex. G at 3-4. Plaintiff again fails to establish a final judgment, much less that the disputed issues were essential to that judgment.

Most significantly, the arbitration decisions do not warrant collateral estoppel because they did not involve the disputed issues in this case. As a result, and by definition, they could not have been necessary to the arbitrator's decisions. Judge Stern took great pains to expressly emphasize

that he was *not* deciding the federal trademark issue, as it was beyond the scope of his authority, and that a later adjudication by the federal court could impact his rulings. *E.g.,* D.E. 140-4, Ex. G at 15; ("It is agreed that I cannot address the trademark issue, as it is a federal question beyond the jurisdiction of the arbitration of this state action and is pending in federal court."); D.E. 140-4, Ex. H at 4 ("The parties have agreed from the beginning of the arbitration that issues relating to the trademark and federal action cannot be part of this arbitration which flows from settlement of the State Court action"); *id.* ("Suffice it to say, however, that the parties before me agree that challenges to the trademark and its impact remain for resolution in federal court."); *id.* at 7 n. 3 ("This award again recognizes the fact that federal litigation is pending, and that it may impact parts of my award."). The Court therefore finds it remarkable that Plaintiff now argues that "the arguments now raised by Defendant are identical to the issues decided as part of the 2003, 2011, and 2012 lawsuits, as well as the Arbitration Award," and that "these issues were fully litigated in numerous cases and in arbitration by all parties involved in the instant action." Pl. Opp'n at 8-9. The federal trademark issue clearly was never litigated in any of these prior adjudications. To the contrary, the parties were warned that later adjudication of this issue could impact the arbitration rulings.

Moreover, aside from the federal trademark issues, Judge Stern acknowledged that "Steven did not sustain his burden in proving [his] independent claims." D.E. 140-4, Ex. G at 16 n. 14. Judge Stern also did not enjoin Vincenzo Sr. from using the name "Anello" in Anello Brothers, but instead required Vincenzo Sr. to compensate Steven for certain costs, fees, and expenses. *Id.* at 15; D.E. 140-5, Ex. I at 1. Even in making these rulings as to who could use the Anello name, Judge Stern again noted that "the federal court may have jurisdiction and authority to consider and address this issue incident to the trademark litigation." D.E. 140-4, Ex. G at 16 n. 12.

For the foregoing reasons, the Court finds that issue preclusion is not applicable. Plaintiff does not demonstrate that the correct parties or their privies existed in prior adjudications. Plaintiff does not explain why non-mutual offensive issue preclusion applies. Plaintiff does not show that identical issues pending before the Court were raised, actually litigated, and necessary to any prior judgment.

Trademark Infringement

Plaintiff alleges trademark infringement under the Section 32(a) of the Lanham Act, 15 U.S.C. § 1114(1)(a), and misrepresentation, false designation of origin, false advertising, and unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Compl. ¶¶ 71-88. "The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 (3d Cir.1994) (internal citations omitted). Trademark infringement occurs when "(1) the marks are valid and legally protectable; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services." *Parks LLC v. Tyson Foods, Inc*, 863 F.3d 220 (3d Cir. 2017) (quoting *Ford Motor Co. v. Summit Motor Prod., Inc.*, 930 F.2d 277, 291 (3d Cir. 1991)).

A "trademark" under the statute

> includes any word, name, symbol, or device, or any combination thereof-- (1) used by a person, or (2) which a person has a bona fide intention to use in commerce and applies to register on the Principal Register established by this chapter, to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.

15 U.S.C. § 1127.  However, a trademark can be refused registration on the Principal Register for numerous reasons, including if it is "merely descriptive or deceptively misdescriptive" of applicant's goods, or if it is "primarily merely a surname."  15 U.S.C. §§ 1052(e)(1), (e)(4).

"A valid and legally protectable mark must be 'distinctive,' which may be shown in two ways."  *Parks LLC v. Tyson Foods, Inc*, 863 F.3d 220, 230 (3d Cir. 2017).  First, "[s]ome marks are, by their very nature, considered distinctive."  *Id.* (citing 2 McCarthy on Trademarks § 11:2).  These "inherently distinctive marks include ones that are arbitrary or fanciful, such as APPLE for computers or SHELL for gasoline."  *Id.* (citing 2 McCarthy on Trademarks § 11:11).  They also include marks that "are suggestive of a product's function but not descriptive such as PENGUIN for freezers or SAMSON for weight training machines."  *Id.* (citing 2 McCarthy on Trademarks § 11:62).  "On the other hand, marks that are merely descriptive of the product are not inherently distinctive and secondary meaning must be proven before such a name will be protectable."  *Id.* (citing 2 McCarthy on Trademarks § 11:2); *see also Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000).  Further, "[t]rademarks based on the surname of a founder are not inherently distinctive."  *Parks*, 863 F.3d at 231 (citing *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 827 n.17 (3d Cir. 2006), *as amended* (May 5, 2006)).  Generic names are not eligible for trademark protection.  *Id.* at 230 n. 16.

As to secondary meaning, the Third Circuit has observed that "[s]econdary meaning exists when the mark is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products or services."  *Id.* at 231 (quoting *Commerce Nat'l*, 214 F.3d at 438) (internal quotations omitted).  The Circuit provided the following factors to assess secondary meaning:

> (1) the extent of sales and advertising leading to buyer association;
> (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5)

customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and, (11) actual confusion.

*Id.* (quoting *Commerce Nat'l*, 214 F.3d at 438).

Registering a trademark does not mean that it is a valid trade mark. *See Matal v. Tam*, 137 S. Ct. 1744, 1753 (2017) (citing 15 U.S.C. § 1057(b)) (explaining that registration is simply "prima facie evidence" of a valid trademark). Federal registration does, however, "confer[] important legal rights and benefits on trademark owners who register their marks." *Id.* (quoting *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1317 (2015)). For example, federal registration on the Principal Register:

> (1) serves as constructive notice of the registrant's claim of ownership of the mark; (2) is prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate; and (3) can make a mark incontestable once a mark has been registered for five years.

*Id.* (quoting 15 U.S.C. §§ 1072, 1057(b), 1065, 1115(b)) (internal citations and quotations omitted). Registration on the Principal Register also "enables the trademark holder to stop the importation into the United States of articles bearing an infringing mark." *Id.* (quoting 3 McCarthy § 19:9) (internal quotations omitted).

Here, Plaintiff's two trademarks – ANELLO (3,988,606) and ANELLO FENCE (4,425,251) – are registered on the Principal Register.[10] D.E. 134-7, Ex. E; D.E. 134-8, Ex. F. This is *prima facie* evidence that the marks are valid. Plaintiff contends that the only defenses available to Defendant are those under 15 U.S.C. 1115(b). Pl. Opp'n at 10, 19. The Court

---

[10] As noted above, Plaintiff's other trademark, ANELLO FENCE (3,713,566), was registered on the Supplemental Register but has since been cancelled, *see* D.E. 134-6, Ex. D at 2, so it is not subject to this dispute.

disagrees Section 1115(b) only applies when a mark has become incontestable under Section 1065. *See* 15 U.S.C. § 1115(b) ("To the extent that the right to use the registered mark has become incontestable under section 1065 of this title, the registration . . . shall be subject to the following defenses . . . ."). Here, Plaintiff's marks (2011, 2013) were within the five-year contestability window when the litigation was commenced in 2013. *See* D.E. 1. As a result, Defendants may raise any legal or equitable ground to challenge the validity of the trademarks.

Defendants argue that the trademarks are not valid because they were procured through fraud, specifically material misrepresentation. Oleske Br. at 14-16. Fraudulent procurement of a trademark is a ground for cancellation of both a contestable and incontestable mark. 15 U.S.C. §§ 1064(3), 1065. The Third Circuit recognizes that

> [t]he Lanham Act provides that a third party may petition for cancellation of a registered trademark if the registration was procured by fraud, a showing that must be made by clear and convincing evidence that the applicant or registrant knowingly made a false, material representation with the intent to deceive the PTO.

*Covertech Fabricating, Inc.*, 855 F.3d 163, 174-75 (3d Cir 2017) (internal quotations, citations, and alterations omitted) (citing 15 U.S.C. §§ 1064(3), 1120; *In re Bose Corp.*, 580 F.3d 1240, 1245 (Fed. Cir. 2009); *Marshak v. Treadwell*, 240 F.3d 184, 196 (3d Cir. 2001)); *see also Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co. LLC*, 223 F. Supp. 3d 207, 214 (D. Del. 2016) ("To prove fraudulent procurement generally, a complainant must show, by clear and convincing evidence, that the registrant knowingly made false, material representations of fact in connection with an application for a registered mark . . . and [that] the registrant had a purpose or intent to deceive the PTO.") (internal quotations and alterations omitted). Further, the "intent to deceive can be inferred from indirect or circumstantial evidence, indicating that the registrant actually knew or believed that someone else had a right to the mark." *Covertech*, 855 F.3d at 175 (internal

quotations and citations omitted) (citing *In re Bose Corp.*, 580 F.3d at 1245; *Marshak*, 240 F.3d at 196).

In *Covertech*, the plaintiff, a manufacturer of protective packaging and reflective insulation, entered into an agreement with the defendant distributer whereby the defendant was the exclusive distributor of the plaintiff's "rFOIL" products, including "ULTRA" – one of the plaintiff's specialty products within this umbrella brand. *Id.* at 168-69. Plaintiff had a United States trademark for rFOIL, and a Canadian trademark for ULTRA. *Id.* The exclusive distribution agreement subsequently broke down. *Id.* The defendant – without notice to, or permission from, the plaintiff – then petitioned for a United States trademark of ULTRA and eventually obtained it. *Id.* After a one-week bench trial, the district court cancelled defendant's registration based on a finding of fraud on the PTO. *Id.* at 169, 174.

The Third Circuit affirmed the decision. *Id.* at 174-75. At trial, the defendant's President, Michael Boulding indicated that "he believed no other person, firm, corporation, or association ha[d] the right to use the mark." *Id.* at 175. The Third Circuit found that the district court was "entirely justified" in finding such testimony not credible "[i]n light of Mr. Boulding's prior interactions with [the plaintiff], [as] he must have known or believed that [the plaintiff] had a right to use the mark." *Id.* The *Covertech* court noted that at the time of Boulding's statement, the defendant was aware that the plaintiff had registered the mark "ULTA" in Canada and continued to sell ULTRA in the United States. *Id.* The Circuit also noted two other intentional misrepresentations that Boulding made to the PTO, but did not evaluate them because this single statement was enough to establish that the defendant obtained registration of the ULTRA mark through fraud. *Id.* at 175 n. 5.

Here, the Court finds that there is no genuine dispute of material fact precluding a finding that Steven Anello procured the trademarks ANELLO (3,988,606) and ANELLO FENCE (4,425,251) through fraud. First, as to ANELLO, Anello Fence, through Steven, applied to register "ANELLO" on the PTO Principal Register on July 22, 2010. D.E. 134-7, Ex. E at 27. Steven claimed first use in April 1963. *Id.* The examiner refused registration as the mark was "merely a surname." McDaniel SOMF ¶ 20. On November 16, 2010, Anello Fence amended its application to allege that the mark had "become distinctive of the goods/services through applicant's substantially exclusive and continuous use in commerce for at least the five years immediately before the date of this statement." *Id.* On July 5, 2011, the examiner issued Anello Fence the service mark ANELLO on the Principal Register. McDaniel SOMF ¶ 21; D.E. 134-7, Ex. E.

The representation of "substantially exclusive and continuous use in commerce for at least the five years immediately before the date of this statement" is demonstrably false. Moreover, Steven's claimed basis for the representation was due to an assignment from Anello Brothers. In its Complaint, Plaintiff asserted that in 2006, Emilio Sr. "retired, and all rights to the business and the 'ANELLO' mark were transferred to the Plaintiff." Compl. ¶ 19. However, this allegation is not only patently false, but Steven also admitted that it was untrue during his deposition.

It is undisputed that Anello Fence had been in business for less than four years at the time of the representation in November 2010. *See* Compl. ¶ 19. Steven started Anello Fence in 2007 so there is no doubt that he was aware of when he began the business. Before that, Steven had another fence company, A Decorative Fence, which he sold to VCA in approximately 2006. After selling A Decorative Fence, Steven moved to Florida and became a full-time law enforcement officer. When he moved to Florida, Steven did not intend to return to New Jersey. Then, upon returning to New Jersey, Steven paid $30,000 to VCA to be released from his restrictive covenant

25

that he had agreed to when he sold A Decorative Fence. Thus, when Steven made the representation on November 16, 2010 concerning five years of continuous use, the representation was false as to Anello Fence (which had been in business less than four years).[11] Nevertheless, in its Complaint, Plaintiff asserted that it had continuous use since 1963 due to its relationship with Anello Brothers.[12]

The Court finds that Steven's claimed first use in 1963, in both the ANELLO (3,988,606) and ANELLO FENCE (4,425,251) marks' applications, is a knowingly false statement sufficient to cancel both marks' registrations. There is no genuine dispute of material fact on the issue to deny summary judgment. Both the ANELLO and ANELLO FENCE marks' applications claimed first use in 1963. D.E. 134-7, Ex. E at 27; D.E. 134-8, Ex. F at 5. As noted, Steven's justification for first use in 1963 is that "[i]n 2006, S. Steven Anello's father retired, and all rights to [Anello Brothers] and the 'ANELLO' mark were transferred to the Plaintiff." Compl. ¶ 19. It is true that Anello Brothers opened in 1963 and built up goodwill in the northern New Jersey fencing industry until Emilio Sr., Steven's father, unilaterally closed the business in 2006. Oleski SOMF ¶ 8,

---

[11] The Court recognizes that at the time Plaintiff applied for the ANELLO FENCE mark (March 21, 2013, D.E. 134-7, Ex. E at 2) Anello Fence had in fact been in business for over five years, making this statement (which was also included in the ANELLO FENCE application, see id. at 33-34) accurate as to that point. However, the statements also claimed that use was "substantially exclusive" in both applications, yet the record indicates that Steven knew that his cousins were competing with him in the northern New Jersey fencing industry during both of these relevant time periods and using the Anello name. See D.E. 140-4, Ex. G at 3 (explaining that Steven paid his cousins $30,000 to void a restrictive covenant that otherwise would have prevented him from competing with his cousins in the northern New Jersey fencing industry). Therefore, the record seems to indicate that this "substantially exclusive" assertion also potentially amounts to fraud in both applications, but the Court does not rule on this issue as it finds that VCA's claim of first use in 1963 is sufficient to cancel both registrations.

[12] Plaintiff's argument as to an assignment from Anello Brothers also does not address the time between Anello Brothers closing in Thanksgiving 2006 and the start of Anello Fence the following spring.

McDaniel SOMF ¶¶ 4, 17; D.E. 140-4, Ex. G at 3. However, Steven was never an owner of Anello Brothers. Therefore, for Steven to entitled to take advantage of Anello Brothers' goodwill, Anello Brothers must have assigned it to him, as Steven alleges. Compl. ¶ 18.

"Formal assignments of trade names are not required, because the law presumes that when a business is conveyed, its trade name and goodwill are also conveyed." *Colonial Elec. & Plumbing Supply of Hammonton, LLC v. Colonial Elec. Supply, Ltd.*, No. 05-5408, 2007 WL 4571105, at *5 (D.N.J. Dec. 27, 2007) (internal citations omitted). However, "[i]f there is no documentary evidence of an assignment, it may be proven by the clear and uncontradicted oral testimony of a person in a position to have actual knowledge." *Id.* (internal citations omitted). Yet, courts "must be cautious in scenarios that do not involve clear written documents of assignment" and must "[r]equir[e] strong evidence to establish an assignment . . . to prevent parties from using self-serving testimony to gain ownership of trademarks." *Id.*

Here, Steven never received an assignment of Anello Brothers' trade name or goodwill. First, the business was never conveyed to him,[13] so assignment of the trade name and goodwill is not assumed. To the contrary, in Spring 2011, Anello Brothers (which had been "essentially defunct" for a little over five years) held a shareholder meeting, where Emilio Jr. joined with

---

[13] The Court also notes that any assignment in gross, or naked assignment, whereby Plaintiff was assigned the name without its goodwill, would not support Plaintiff's argument that the trademark is valid. "A purported assignment of a trademark without goodwill is an invalid assignment in gross." *InterState Net Bank v. NetB@nk, Inc.*, 348 F. Supp. 2d 340, 349 (D.N.J. 2004) (internal quotations omitted). The assignment of a mark without its goodwill is also referred to as a naked assignment. *See, e.g., Zinn v. Sugura*, No. 35-3572, 2006 WL 2135811, *6 (D.N.J. July 28, 2006). Such assignments are prohibited because "[u]se of the mark by the assignee in connection with a different goodwill and different product would result in a fraud on the purchasing public who reasonably assume that the mark signifies the same thing, whether used by one person or another." *InterState Net Bank*, 348 F. Supp. 2d at 349. Thus, even if there was a genuine issue of material fact as to the assignment, the trademark would nevertheless be invalid because it is undisputed that the actual Anello Brothers business was not transferred along with the mark.

Vincenzo Sr. to (1) oust Emilio Sr. from his position as president, and (2) re-open the business. D.E. 140-4, Ex. G at 3. Therefore, there is no evidence that Anello Brothers was conveyed to Steven or Anello Fence.

Although Steven claims that his father, Emilio Sr., the former President of Anello Brothers, assigned the business' rights to him, Compl. ¶ 19, there is no evidence of this. The closest the record comes to an assignment is that Emilio Sr. knew of, and *had no objection to*, Steven's use of the Anello name after Anello Brothers' closure in 2006. D.E. 140-4, Ex. G at 15. Steven has presented no authority that a mere lack of objection equates to an assignment. Moreover, Emilio Sr. was not even a majority shareholder of Anello Brothers at the time. *Id.* This is far from a valid assignment of Anello Brothers' goodwill and trade name.

Critically, by the time of his deposition, Steven admitted that there had not been an assignment from Anello Brothers. Steven admitted that he did *not* receive "any type of permission to use the name Anello" in his fence company from Anello Brothers. D.E. 134-9, Ex. G at 10-11, ¶¶ 25-5. Instead, he claimed that the Anello name had been "abandoned"[14] and that "[a]nyone of the brothers" could have used and trademarked the name before he chose to do so. *Id.* at 52-3, ¶¶ 23-25. Therefore, by his own admission, the record indicates that Steven did not receive an assignment.

In sum, the foregoing evidence shows that Steven made a materially false misrepresentation with intent to deceive the PTO in claiming his continuous use of the marks ANELLO and ANELLO FENCE since 1963. The Court recognizes that such a finding is relatively

---

[14] Even the abandonment argument appears to be erroneous. Instead, as noted, Anello Brothers was idle between 2006 and 2011. Judge Stern ruled that Vincenzo Sr. could use "Anello Brothers" provided he paid for part of Steven's counsel fees in bringing the 2011 action. D.E. 140-4, Ex. 6 at 16.

rare at the summary judgment stage, but Steven has pointed to no evidence demonstrating that his material misrepresentations were the result of a mistake or mere negligence. Indeed, he admitted to a contrary view at his deposition. As noted, Steven's primary response was issue preclusion, which the Court has rejected. Thus, the Court agrees with Defendant that there is no genuine issue of material fact precluding a finding that Steven procured the ANELLO (3,988,606) and ANELLO FENCE (4,425,251) trademarks through fraud. The Court orders that these marks be cancelled accordingly.

VCA also argues that it had priority of use as to the name Anello. McDaniel Br. at 12. "The first use test is generally proper for unregistered trademarks, taking account of the well-established common law principle of 'first-in-time, first-in-right' that rewards actual and continuous use in commerce as between market competitors." *Covertech Fabricating, Inc.*, 855 F.3d at 170 (citing *Ford Motor Co.*, 930 F.2d at 292). "With respect to ownership of an unregistered mark, the first party to adopt a mark can assert ownership so long as it continuously uses the mark in commerce." *Commerce Nat. Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000) (quoting *Ford Motor Co.*, 930 F.2d at 292). The rule is long-established. *Columbia Mill Co v. Alcorn*, 150 U.S. 460, 463-64 (1893) ("the exclusive right to the use of the mark . . . is founded on priority of appropriation; that is to say, the claimant of the trade-mark must have been the first to use or employ the same on like articles of production."). Notably, the prior mark need not be registered to successfully assert ownership through prior use. *Santana Prod., Inc. v. Compression Polymers, Inc.*, 8 F.3d 152, 155 (3d Cir. 1993) ("[A] party's right to use a trademark is not dependent on its registration"). Therefore, a later user of a mark has no right to exclusive use or ownership of the mark against a prior user who continuously used that mark in the industry. *Commerce Nat. Ins. Servs., Inc.*, 214 F.3d at 438; *see also Gruelle v. Molly-*

*'Es Doll Outfitters*, 94 F.2d 172, 176 (3d Cir. 1937) (holding that defendants had no exclusive right to use certain marks "in view of the prior use of these trade-marks" by plaintiff). Because the later user has no exclusive right to the mark, prior use provides grounds for cancellation of the later mark. *Blanchard Importing & Distrib. Co. v. Charles Gilman & Son, Inc.*, 353 F.2d 400, 401 (1st Cir. 1965) ("As between conflicting claimants, it is well settled that the right to use the same mark is based on priority of appropriation and that prior use of a trademark is a valid ground for cancellation." (citing *California Piece Dye Works v. California Hand Prints*, 159 F.2d 871 (C.C.P.A. 1947)) (internal citations omitted)); *see also Country Floors, Inc. v. P'ship Composed of Gepner & Ford*, 930 F.2d 1056, 1066 (3d Cir. 1991) (explaining that "[c]ancellation of the registration depended on resolution of disputed factual issues concerning prior use, scope of that use, and the possibilities of concurrent registration" and remanding the case to resolve these disputed factual issues); *Nat. Footwear Ltd. v. Hart Schaffner & Marx & Roots, Inc.*, 577 F. Supp. 128, 133 (D.N.J. 1983) ("right to cancellation not limited to prior use of technical trademark; any prior use of a name or word is sufficient where the prior user is injured by the registration" (citing *Blanchard Importing & Distrib. Co.*, 353 F.2d at 401)).

Here, Defendant VCA opened in 2003 and indicates that it has been using the name Anello in its advertisements since that period. McDaniel SOMF ¶¶ 15, 16. Of course, it is this very use that Plaintiff now claims is trademark infringement. Compl. ¶¶ 46, 48. Plaintiff Anello Fence did not open until 2007, Compl. ¶ 19 – four years *after* Defendant began using the name. In fact, after VCA opened and before Steven started Anello Fence, Steven sold his other fence company, A Decorative Fence, to VCA. D.E. 140-4, Ex. G at 2. Plaintiff does not offer any evidence to dispute VCA's continuous use of the Anello name since 2003. The only response that Plaintiff provides

as to VCA's continuous and prior use is that the 2003 Order prohibited VCA from using the name Anello. Pl. Opp'n at 16-17. For the reasons discussed as to issue preclusion, the Court disagrees.

While not necessary to the Court's decision, the Court also finds Plaintiff's argument to strain credulity. Steven knew that Defendant had been operating since 2003 and Steven in fact sold his own fencing business, A Decorative Fence, to Defendant when Steven moved to Florida to become a police officer. D.E. 140-4, Ex. G at 2. Steven then paid Defendant $30,000 upon his return to New Jersey so that Defendant would not enforce its restrictive covenant (included in its purchase of A Decorative Fence) against him. *Id.* at 3. The Court finds it incredible for Steven to now claim that he was not aware of Defendant's prior use of Anello. However, whether Steven knew or not is secondary to fact that there is no evidence disputing that Defendant did use the Anello name before Plaintiff did. As a result, there is no genuine issue of material fact, and the first-in-time, first-in-right doctrine applies to give Defendant superior rights to those of Plaintiff.[15]

Because the ANELLO and ANELLO FENCE marks are not valid, Defendant argues that the remaining causes of action also fail as a matter of law because they all rely on the validity of the marks. McDaniel Br. at 14-15. In response, Plaintiff indicates that certain causes of action, such as New Jersey's unfair competition law and tortious interference may address conduct beyond trademark infringement. Pl. Opp'n at 19-20. While this may be accurate as a legal proposition, Plaintiff's analysis nevertheless indicates that its claims are all based on trademark infringement.[16]

---

[15] The Court finds the foregoing issues to be dispositive as to trademark infringement. As a result, the Court does not reach the parties' remaining arguments, including those regarding secondary meaning, likelihood of confusion, or fair use.

[16] Plaintiff argues the following:

> Here, it is undisputed that Plaintiff owns the ANELLO marks, thereby satisfying the second element of a Lanham Act violation. As set forth in greater detail in Section II-IV, *supra*, Defendant has

*Id.* The closest Plaintiff comes to a non-infringement argument is its allegation of malicious conduct, based on alleged violations of 2003 Order, the 2011 Order, and the arbitration awards. *Id.* The Court has already found these assertions to be without merit. As a result, the Court grants Defendant VCA summary judgment on the remaining counts.

Motions in Limine

Defendant VCA filed a motion in limine seeking to preclude the expert testimony of Gary B. Rosen. D.E. 135. Because the Court is granting summary judgment, the Court finds this motion to be moot and denies it accordingly.[17]

---

failed to establish as a matter of law that Plaintiff's marks are not valid and legally protectable. Moreover, as detailed in Sections I, II(B), III-IV, *supra*, Defendant's use of the name "Anello" is malicious as it is in violation of numerous Court Orders and the Arbitration Award. Finally, as discussed in Section II(B), *supra*, Plaintiff has provided evidence of numerous examples of customer confusion.

*Id.* (internal citations omitted).

[17] Additionally, it is the Court's practice that motions in limine are timely only after the Court's final pretrial order is entered. No final pretrial order has been entered in this matter.

**III. CONCLUSION**

For the reasons set forth above, Defendant VCA's motions for summary judgment, D.E. 133, 134, are granted. Pursuant to 15 U.S.C. § 1119, the Court orders the Director of the United States Patent and Trademark Office to cancel the Registrations ANELLO (Reg. No. 3,988,606) and ANELLO FENCE (Reg. No. 4,425,251). Plaintiff's request to supplement the record, D.E. 149, is granted, but does not alter the Court's analysis. Defendant VCA's motion in limine, D.E. 135, is denied as moot. The parties are to address within 14 days, in writing and on the docket, how, if at all, the Court's Opinion and Order impacts Defendant's pending counterclaims as well as Plaintiff's claims against Defendant Shopper's Guide, LLC. An appropriate Order accompanies this Opinion.

Date: January 28, 2019

John Michael Vazquez, U.S.D.J.